**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
Case No. 6:16-CV-0744-ORL-31GJK

Kathy Ann Pflugbeil,

        Petitioner,


v.


Diamond Resorts U.S. Collection
Development, LLC; Diamond Resorts
International, Inc.,

        Respondents.

_____/

<u>SECOND AMENDED PETITION TO COMPEL</u>
<u>ARBITRATION IN ORANGE COUNTY, FLORIDA</u>
<u>AND OTHER RELIEF WITH MEMORANDUM OF LAW</u>

      COME NOW the Petitioner, by and through the undersigned attorney, pursuant to 9 USC § 4, and hereby petitions this Court to compel arbitration in the locale selected by her in which to arbitrate a case with the Respondents pending before the American Arbitration Association, case no. 01-16-0000-4213, *Kathy Ann Pflugbeil v Diamond Resorts International, Inc. et al* and for other relief as set forth hereinafter. As grounds for this Petition, the Petitioner will represent as follows:

      The Petitioner in this case is an individual consumer who has purchased into a timeshare "points" program with Respondent Diamond Resorts U.S. Collection Development, LLC, a wholly owned subsidiary of developer Diamond Resorts International, Inc. (the "Developers" or "Respondents"). Each of these companies do business in the State of Florida. The latter is publically traded.

      The Petitioner has signed an agreement drafted by the Respondent(s) (the "Agreement") containing a clause providing for arbitration in the county in which the Agreement was executed in the event of a dispute (the "Arbitration Clause"). A true copy of the Agreement is attached in pertinent part as exhibit A. The Petitioner respectfully suggests that the enforcement of this

forum location clause works an unfair hardship on her ability to contest issues that have arisen to her detriment.

The Petitioner has initiated an arbitration case through counsel located in the Orlando area, with the American Arbitration Association ("AAA') under the provision(s) cited.  The Developers have requested that the American Arbitration Association transfer the case to Williamsburg, Virginia, where the Petitioner was on vacation when she signed the Agreement. She requests that this Court issue an Order that the AAA retain control over this case in the present location, and will respectfully set forth the following grounds as the basis for this requests:

The Arbitration Clause provides, in pertinent part:

"…If a participatory arbitration hearing is requested, it will take place in the County where this Agreement was signed or, if the Administrator determines that such location would be unfair to the Purcahser, at a location reasonably convenient to the Purchaser." *Agreement, p. 7, part 18(d).*

The Respondents will likely concede that in the vast majority of cases the timeshare point of sale will take place while a vacationer is at a resort destination. By definition then, rarely if ever will the location of purchase be fair to the patron, who lives elsewhere. On the other hand, such a location would greatly benefit the Developers, who also by definition will have offices there.

The Federal Arbitration Act governing this proceeding speaks to the location issue only tangentially, providing that a local federal court can compel arbitration only in the district where it sits.  9 USC § 4 "The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed".

However, as a matter of general practice, the stated location policy of the AAA is accede to the selection of the consumer *claimant*. In fact, in consumer related cases under $75,000, a business respondent is required to waive enforcement of a location clause contained in an arbitration agreement if it's not convenient or practical for the claimant.[1]

---

[1] See AAA online publication at  https://www.adr.org/aaa/ShowPDF?doc=ADRSTG_013007frequently asked questions.

And regardless of how this case is formally characterized, it involves individual consumers executing boilerplate arbitration provisions drafted by a multinational corporation that are not the product of individually negotiated arms-length transactions.

This 'consumer vs. commercial' issue was heard in <u>Gardner Pool Plastering, Inc. v. Law,</u> No. D055220 (Cal. App. 6/10/2010) (Cal. App., 2010). The court in <u>Gardner</u> considered numerous sources in determining whether an arbitration dispute was properly characterized as 'commercial dispute resolution' subject to the Section 1284.3 of the California Civil Code requiring the Responding Company to pay the arbitration forum fees. The court there cited the *Judicial Council Ethics Standards for Neutral Arbitrators in Contractual Arbitration*, which defines a consumer arbitration as "an arbitration conducted under a pre-dispute arbitration provision contained in a contract" where the "consumer party was required to accept the arbitration provision in the contract." (Cal. Rules of Court (2009 Ed.), *Ethics Stds. for Neutral Arbitrators in Contractual Arbitration, std. 2*, subd. (d)(3), p. 621) (Emphasis added.) <u>Id.</u> at 55225.  **In other words, as in this case, *the contract will be executed with the arbitration clause in it, or not at all.***

The Court in Gardener went on to consider the dictionary definition of "consumer", quoting  <u>Black's Law Dict.</u> (8th ed.2004) p. 335, col. 1,  defining "consumer" as a "person who buys goods or services for *personal*, family, or household use, *with no intention of resale*". We believe that the Respondents will concede, in this context, that the interests sold in the resorts that it manages are not for commercial investment or resale. <u>Id.</u>

Of course arbitration is intended to be a more cost effective alternative to litigation, and the Federal Arbitration Act imposes significant limits on judicial review of arbitrator's awards so that arbitration will be an "efficient and cost-effective" alternative to litigation for the parties. <u>Positive Software Sols., Inc. v. New Century Mortg. Corp.,</u> 476 F.3d 278, 280 (5th Cir. 2007) (en banc); <u>New Hope Cmty. Church v. Patriot Energy Partners</u>, LLC, 6 N.E.3d 70 (Ohio App., 2013); <u>Kennedy Hodges, L. L.P. v. Gobellan</u>, 433 S.W.3d 542, 57 Tex. Sup. Ct. J. 584 (Tex., 2014) <u>Sultaana v. Drummond Fin. Servs., L.L.C.</u>, 2014 Ohio 938 (Ohio App., 2014).

Thus, for example, an arbitration clause imposing significant forum fees on a claimant will not be enforced at all.  <u>Sonic-Calabasas A, Inc. v. Moreno</u>, 57 Cal.4th 1109, 311 P.3d 184, 163 Cal. Rptr. 3d 269 (Cal., 2013); <u>Morrison v. Circuit City Stores, Inc.</u>, 317 F.3d 646 (6th Cir.,

2003) (if the fees and costs of the arbitral forum deter potential litigants, then that forum is clearly not an effective, or even adequate, substitute for the judicial forum).

By virtue of the AAA's classification of this case as 'commercial' cases, presumably because the Respondent's template contract so characterizes them, the arbitration fees are substantially higher than they would otherwise be. Indeed, the expense of arbitration in similar cases including administrative and arbitration fees combined has been running in the order of $20,000. A representative sample of an arbitrator's claim for compensation in a similar involving the undersigned is attached as exhibit B. Based upon the foregoing principals this Court should order that these cases be classified as consumer related cases so as to reduce the financial hardship otherwise inuring to the Petitioners.

In this respect, the Petitioner, regardless of her own location, has already expressed a preference to arbitrate this case in Florida, and retained counsel of record located in Florida. To require travel elsewhere in this process would be unnecessarily and indeed prohibitively costly, in derogation of the cited principles. ***Indeed, if this case is relocated to the Respondents' location, the only party benefiting would be the multi-national Respondent-Corporation.  In that instance, both Claimant and counsel for the Claimant would have to travel thousands of miles overseas.[2]***

In other cases pending involving the same attorneys,  counsel for the Respondent has requested, and counsel for the claimants have agreed, that with regard to all cases arbitrated in Florida, its Nevada-based employees are welcome to appear by phone or other audio-visual media. In addition, the Respondent has offices in Florida out of which it does business.[3]

Moreover, the Respondent Diamond Resorts International, Inc.  is a large multinational corporation that is publically traded, with extensive holdings globally, all of which is verifiable through reference to public filings with the S.E.C.[4]  Accordingly, it is much more in keeping with the law of this case as well as the equities generally governing arbitration as cost effect but fair means of dispute resolution, to require the multinational corporation to bear the additional costs, if any, in association with keeping the *status quo.* [5]

---

[2] Hawaii is located 2,550 statute miles southwest of the U.S. mainland.
http://www.worldatlas.com/webimage/countrys/namerica/usstates/hilatlog.htm
[3] http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=DIA
[4] https://www.sec.gov/Archives/edgar/data/1566897/000156689715000015/0001566897-15-000015-index.htm
[5] The Claimants are not aware of any additional costs that would inure to the Respondent and none have been cited

An analogous situation occurred in  Washington Square Securities, Inc. v. Sowers, 218 F.Supp.2d 1108 (D. Minn., 2002). In that case, a federal district Court in Minnesota declined to relocate or stay a pending arbitration near the West Virginia location chosen by the Claimants. In that instance, the Court took pains to emphasize the financial hardship to the Claimants that would occur if an arbitration clause providing for a Minnesota location were enforced:  "An order vacating that proceeding in favor of a newly-filed Minnesota lawsuit will impose a far greater economic burden on defendants than will be borne by the far larger plaintiff corporation. [The Respondent], with its formidable financial assets and national scope, can easily bear the cost of completing the arbitration in which it has been engaged until this date. The same cannot be said for these investors who have — at least according to their claims — lost significant sums due to the perfidy of [the broker]." Id. at 1112. (Citing Lyon Fin. Serv. v. PowerNet, Inc., 2001 WL 1640099, 2001 U.S.Dist. LEXIS 20193 (D.Minn. Nov. 19, 2001) (balancing financial burden to compare hardship)). Thus the court refused to transfer the location of the proceeding even though the arbitration clause in the case purported to require dispute resolution in the district of the brokerage headquarters.

Similarly, in Peregrine Financials & Securities v. Hakakha, 788 N.E.2d 263, 338 Ill. App.3d 197, 272 Ill.Dec. 959 (Ill. App., 2003)  a securities firm whose standard brokerage contract contained an arbitration clause was sued by its client Hakakha. Peregrine subsequently sought arbitration with the National Association of Securities Dealers (NASD) and obtained an order requiring arbitration in Illinois, which was reversed on appeal in favor of the claimant's Los Angeles home. In it, the court cited Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer, 49 F.3d 323 (C.A.7 (Ill.), 1995), a case involving this jurisdiction.

In Merrill, as well, the Seventh United States Circuit upheld a decision of the District Court declining to compel arbitration in its district, despite the location of the brokerage there, as well as the Claimants at the time that the brokerage contract containing the arbitration clause was signed. Id. After the Claimants in Merrill had moved to Florida, selecting the American Arbitration Association as their preferred forum under a clause that otherwise didn't specify a locale for arbitration, the AAA accepted the filing in Tampa and acknowledged the appropriateness of that forum location. Id. The federal court heard and denied the Respondents' Petition to Stay transfer the locale to Illinois, acceding the wishes of the claimants and the AAA's acceptance of their petition locally.

So there is ample legal authority as well as very compelling practical and equitable reasons why this case should remain in Florida. We hope and trust that this Court will weigh the merits of this situation accordingly, and grant this request to keep the cases local to Orlando.

WHEREFORE, the Petitioners will request the following relief:

a. That this Court Order that the pending arbitration in case no. 01-16-0000-4213 involving *Kathy Ann Pflugbeil v Diamond Resorts International, Inc. et al*. be conducted in Orlando, Orange County, Florida;

b. That the Court enter a declaratory Order that the disputes in question are of a 'consumer' nature and that the AAA's Rules of Consumer Arbitration apply to them;

c. That the Court award attorney fees and costs in association with the prosecution of this case consistent with the Arbitration Agreement;

d. That the Court enter an order staying the pending Arbitrations pending resolution of the issues in this case.

e. That this Court grant any additional relief as may be just and equitable.

/s/ Austin N. Aaronson, Esquire
AARONSON, AUSTIN, P.A.
Austin N. Aaronson, Esq.
FL Bar No.: 749140
2180 W. State Rd. 434, Ste. 6136
Longwood, FL 32779
Phone: 407-644-1336
aa@aaronsonaustin.com

Rev. 1/1/14



17187413-DRUSC Wrap Purchase and Security Agreement Virginia

## DIAMOND RESORTS U.S. COLLECTION

## PURCHASE AND SECURITY AGREEMENT

**THIS PURCHASE AND SECURITY AGREEMENT** (this "**Agreement**") is made and entered into this **24th day of July, 2015** ("**Effective Date**")by and between Diamond Resorts U.S. Collection Development, LLC, a Delaware limited liability company ("**Seller**"), whose address and principal place of business is 10600 West Charleston Blvd., Las Vegas, Nevada 89135 and whose telephone number is 702-684-8000, and **K. R. PFLUGBEIL** (whether one or more, "**Purchaser**", collectively with Seller, the "**Parties**"). In the event of more than one Purchaser, ownership shall be as joint tenants with rights of survivorship, and not as tenants-in-common.

Seller agrees to sell and Purchaser agrees to purchase the following described property (the "**Membership**") upon the following price, terms, and conditions, including but not limited to the Further Terms and Conditions set forth herein:

Membership in Diamond Resorts U.S. Collection (the "**Collection**"), which includes (i) membership in the Diamond Resorts U.S. Collection Members Association, a non-stock, non-profit Delaware corporation (the "**Association**"), whose principal place of business is located in Clark County, Nevada, and (ii) the following Points for use in the Collection:

Points: <u>22500</u>     Initial Use Year: <u>2016</u>

## BASE PURCHASE TERMS
## ITEMIZATION OF AMOUNT FINANCED (for financed sales)

| | | | |
|---|---|---|---|
| 1. | Purchase Price of Membership: (**"Purchase Price"**) | | **$86,350.00** |
| 2. | Initial Cash Deposit: | **$17,270.00** | |
| 3. | Less *trade in value* of any Timeshare Interest conveyed to the seller as part of your purchase (applies only to "upgrade" sales) | | |
| | a. Ascribed Equity Value of Timeshare Interest(s): | **$0.00** | |
| | b. Other Amounts Owed: | **$0.00** | |
| | c. Total Trade in value: (line a minus line b) | **$0.00** | |
| | d. Other Amounts Paid at closing: | **$0.00** | |
| 4. | Additional Cash Deposits Due: | | |
| | a. On or before | **$0.00** | |
| | b. On or before: | **$0.00** | |
| 5. | Total Down Payment (total of lines 2, 3.c, 4.a., and 4.b.): | | **$17,270.00** |
| 6. | Credits (if any): | | **$0.00** |
| 7. | Base Amount: (line 1 minus line 5 minus line 6) | | **$69,080.00** |
| 8. | Financed Closing Costs payable to_____ | | **$750.00** |
| 9. | Amount Financed or Due in Cash at Closing (line 7 plus line 8): (**"Unpaid Balance"**) | | **$69,830.00** |
| 10. | Current Outstanding Principal Balance plus Accrued but Unpaid Interest Due on Existing Timeshare Interest: | | **$21,742.11** |
| 11. | Total Amount Financed or Due in Cash at Closing (line 9 plus line 10): (**"Unpaid Balance"**) | | **$91,572.11** |
| | <u>**Closing Costs**</u> | | |
| A. | Closing Costs to Seller | | **$40.00** |
| B. | Closing Costs to Purchaser | | **$825.00** |
| C. | Total Estimated Closing Costs | | **$865.00** |
| | <u>**Other Costs**</u> | | |
| D. | Initial Use Year's Association standard Assessments (estimated): Purchaser will be billed for Assessments separately by the Association | | **3,565.00** |

DMWEST #8066291 v6

## Exhibit A

Purchaser desires to pay the Unpaid Balance in lawful currency of the United States, by using the following method (check one), subject to the Terms and Conditions contained herein:

☐ Cash Payment or Third-Party Financing          ☐ Seller Financing

☐ Credit Card Type:_____ Number:_____ Expiration Date:_____

If Purchaser obtains purchase money financing from Seller, Purchaser will also be responsible for the payment of all charges incident to the extension of credit, which charges are specified in the Truth-in-Lending Disclosure Statement furnished to Purchaser, including but not limited to monthly installments of principal and interest, late charges (if applicable), and a monthly collection fee of **Six dollars ($6.00)**. Finally, Purchaser will be required to pay the Closing Costs to Seller and Other Costs specified above. Such closing costs are the same for cash and credit sales hereunder.

Monthly Payment Method:

☒ Statement          ☐ SurePay (Credit or Debit Card)  ☐ SurePay (Checking or Savings Account)

Enrollment in THE Club Exchange Program:

Purchaser acknowledges that he or she will automatically be enrolled in THE Club exchange program ("**THE Club**®"). See Section 8 below for additional details.

Purchaser Contact:

Purchaser hereby advises Seller that Purchaser is willing to receive information regarding Purchaser's financing or for his or her membership in the Collection or THE Club by means of (select one):

☒ Mail          ☐ E-mail

If Purchaser has elected to receive information by E-mail, Purchaser represents that Purchaser has a computer and all related hardware and software required to open, display, save and print a PDF file that does not exceed 2 MB in size.

## FURTHER TERMS AND CONDITIONS

1.      **DEFINITIONS:**

Unless the context suggests otherwise, capitalized terms shall have the meanings set forth in the Amended and Restated Declaration for Diamond Resorts U.S. Collection ("**Declaration**"), as may be amended or modified from time to time.

2.      **PAYMENT OF PURCHASE PRICE:**

        (a)      Purchaser may pay for the Membership in cash or through credit from Seller, subject to Seller's credit approval ("**Financing**"). If Purchaser receives Financing from Seller, then Purchaser will be required to execute and deliver an installment Promissory Note (the "**Note**") payable to the order of Seller in the amount of the Unpaid Balance, and grant the first priority Seller Security Interest (defined below) that secures the payment of the Note and encumbers Purchaser's Membership, as well as certain other documents and instruments which Seller, in its sole discretion, deems reasonably necessary or appropriate to secure Purchaser's payment of the Note. Purchaser will be subject to all of the terms, provisions, and conditions described and set forth in all such documents and instruments.

        (b)      If Purchaser requests Financing, Seller may, **but is not required to**, agree to finance Purchaser's purchase. Purchaser promises that all personal financial and other information submitted to Seller is and will be accurate, and Purchaser authorizes Seller to make credit inquiries regarding Purchaser, whether through a consumer reporting agency or other means. Purchaser agrees to provide immediate written notice to Seller of any material adverse change in Purchaser's financial condition that occurs prior to Closing (as defined below). If Purchaser makes good faith efforts to obtain purchase money financing but is unable to qualify for Financing within 10 days following Seller's acceptance of this Agreement, Purchaser shall be entitled to terminate this Agreement and receive a refund of any and all payments made by Purchaser hereunder (without interest) or, at Purchaser's option, to consummate the transaction contemplated hereby by paying the entire Unpaid Balance in cash at Closing. If Purchaser is unable to qualify for Financing within such 10 day period, Seller shall provide written notice thereof to Purchaser, whereupon Purchaser shall promptly notify Seller whether Purchaser elects to terminate this Agreement or consummate the transaction as provided in the preceding sentence. If Purchaser fails to give any notice to Seller within 20 days after Purchaser's receipt of Seller's notice that Purchaser does not qualify for Financing, Seller may at any time thereafter terminate this Agreement and refund to Purchaser all payments made by Purchaser. Seller reserves the right, in its sole discretion, to sell or assign the Note and the Seller Security Interest to another person or entity, whether or not such person or entity is affiliated with Seller.

        (c)      If Purchaser is exchanging a fee simple timeshare interest in a timeshare resort ("**Fee Timeshare Interest**") as full or partial payment for the Membership, Purchaser agrees to execute and deliver to Seller, on the date hereof, a deed or other appropriate instrument in form and substance satisfactory to Seller, in its sole discretion, pursuant to which all of Purchaser's right, title, and interest in and to the Fee Timeshare Interest is conveyed to Seller or a party designated by Seller, free and clear of any liens or encumbrances not expressly approved by Seller ("**Deed-back**"), and if Seller so requests, a declaration of annexation or other similar type of document subjecting the Fee Timeshare Interest to the Declaration ("**Annexation Instrument**"). Such Deed-back and Annexation Instrument may be recorded by Seller upon Closing. Pending Closing, Purchaser shall remain fully liable for all costs, expenses, and other obligations of any and every kind related to the Fee Timeshare Interest ("**Fee Timeshare Interest Obligations**"). If the transaction contemplated hereby fails to close for any

reason whatsoever, the Deed-back and Annexation Instrument will be cancelled and returned to Purchaser, and Purchaser will remain fully liable for the Fee Timeshare Interest Obligations.

(d)      If (i) Purchaser already owns a timeshare interest (the "Existing Timeshare Interest") that it acquired from Seller or an affiliate of Seller (collectively, "Diamond Resorts"); and (ii) Diamond Resorts financed a portion of the purchase price of the Existing Timeshare Interest, then Seller may (but shall not be obligated to) cause Diamond Resorts to cancel the promissory note made by Purchaser to the order of Diamond Resorts as of Closing, in which case the outstanding principal balance of such promissory note, together with any accrued but unpaid interest due thereon, shall be added to the original principal amount of the Note, subject to all of the terms, provisions, and conditions of Paragraph 2 hereof. In addition, if Seller so requests, Purchaser agrees to execute and deliver to Seller, on the date hereof, a declaration of annexation or other similar type of document, pursuant to which the Existing Timeshare Interest is subjected to the Declaration (the "Diamond Resorts Annexation Instrument"). Such Diamond Resorts Annexation Instrument may be recorded by Seller upon Closing. If the transaction contemplated hereby fails to close for any reason whatsoever, the Diamond Resorts Annexation Instrument will be returned to Purchaser. Whether or not such transaction closes, Purchaser shall remain fully liable for all costs, expenses, and other obligations of any and every kind related to the Existing Timeshare Interest.

(e)      In the event that the Note, this Agreement, or the Deed-back and Annexation Instrument (if applicable), or any other document or instrument which evidences or secures payment of the Purchase Price, is misplaced or has not been completely and validly executed by Purchaser for any reason whatsoever, Seller shall have the option, in its sole discretion, to cancel this Agreement at any time prior to Closing; or to send Purchaser whatever document(s) and/or instrument(s) that Seller needs Purchaser to re-execute, along with instructions on how to do so. In the event that Seller elects to cancel this Agreement, Seller shall provide written notice thereof to Purchaser and cause any funds held on Purchaser's behalf, without interest, to be refunded by Escrow Agent (defined below), to Purchaser, in which event this Agreement shall be deemed terminated and of no further force or legal effect. In the event Seller sends Purchaser any document or instrument for re-execution, Purchaser shall promptly re-execute same, cause his or her signature to be notarized (to the extent indicated), and return such document(s) and/or instrument(s) to Seller in accordance with Seller's written instructions. Purchaser's failure to do so for any reason within 10 calendar days following Purchaser's receipt thereof shall constitute a default hereunder, entitling Seller to exercise its available rights and remedies pursuant to Section 14 below.

## NOTICE

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR.**

3.    **EFFECTIVE DATE OF AGREEMENT:**

It is understood that Seller can accept or reject this Agreement. If Seller rejects this Agreement, Purchaser is only entitled to a refund of any payments made by Purchaser, without interest. If Seller accepts this Agreement, then Seller, subject to Section 2 above, agrees to sell the Membership to Purchaser, and Purchaser agrees to make all of the payments required to be made under this Agreement when due and otherwise to comply fully with all of the terms, provisions, and conditions hereof and of the Collection Instruments. Unless otherwise required by law, Purchaser's cancellation period begins as of the Effective Date.

4.    **DEPOSITS:**

Purchaser's initial deposit and any subsequent payments made by Purchaser to Seller prior to Closing shall be delivered to and held in escrow by First American Title Insurance Company, the address of which is 1160 Town Center Drive, Suite 100, Las Vegas, Nevada 89144 (**"Escrow Agent"**), pursuant to a Master Escrow Agreement by and between Seller and Escrow Agent, the terms, provisions, and conditions of which are incorporated by this reference. Any and all interest that accrues on Purchaser's deposit and subsequent payments shall, except to the extent prohibited by law, be payable to and inure to the sole benefit of Seller and not be credited toward the Purchase Price. Escrow Agent shall hold all such deposits and other amounts until presentation by Seller of written instructions to the effect that Closing has occurred. Seller shall have no right to use any of the funds held by Escrow Agent until such funds have been delivered to Seller in accordance with the provisions hereof.

5.    **VACATION OWNERSHIP PLAN:**

(a)      The Membership is a form of a "right-to-use" timeshare interest, and Purchaser will not receive a deed to any interest in real property.

(b)      Purchaser acknowledges that notwithstanding any provision of this Agreement or the Collection Instruments, unless Purchaser is purchasing Specific Use Points, Purchaser will **not** have the guaranteed exclusive right to reserve, use, and occupy any particular Collection Accommodation. Purchase acknowledges that the Membership is subject to the Collection Instruments as amended and/or supplemented from time to time.

(c)      The Collection shall be perpetual unless terminated by the Members in the manner described in the Collection Instruments.

(d)      Purchaser may be prohibited from making a reservation or using and occupying a Collection Accommodation unless Purchaser has timely paid any and all Assessments, Personal Charges and other amounts levied pursuant to the Collection Instruments and otherwise fully complied with all of the terms, provisions, and conditions of the Collection Instruments.

6.     **ASSOCIATION MEMBERSHIP AND TRANSFER:**

Upon Closing, Purchaser will automatically become a Member of the Association.  Purchaser agrees to be subject to and to comply fully with the Collection Instruments.  If the number of a Member's annual allotment of Points falls below the Minimum Points Threshold for any reason, such as the partial transfer of Points or expiration of Term Points, the affected Membership will cease to be a valid Membership unless sufficient additional Points are acquired to meet the Minimum Points Threshold.  The current Minimum Points Threshold for a valid Membership is 2,000 Points.  Any purchase of additional Points will be governed by prices in effect at the time of purchase.  Purchaser's right to sell or otherwise transfer his or her Membership and the resulting update to the Register of Members is subject to prior approval by the Association and certain other applicable requirements set forth in the Collection Instruments.

7.     **ASSESSMENTS:**

(a)     Purchaser understands and agrees that in accordance with the provisions of the Collection Instruments, the Association is empowered to levy and collect Assessments against each Membership for management and maintenance expenses.  In addition to Assessments, Purchaser understands and agrees that he or she will be responsible for the timely payment to the Association of any Personal Charges or other charges that he or she incurs, all in accordance with the provisions of the Collection Instruments.  Assessments shall be due and payable to the Association prior to Purchaser's use and occupancy of a Collection Accommodation in Purchaser's Initial Use Year, as set forth on Page 1 hereof.  The amount of the Assessments each year may vary and will be determined as outlined in the Collection Instruments.

(b)     The Association may enforce Purchaser's obligation to pay Assessments and Personal Charges in the manner set forth in this Agreement and in the Collection Instruments or as otherwise permitted by law.  Purchaser may be prohibited from reserving, using, or occupying any Collection Accommodation or exercising any other rights, benefits, or privileges to which Purchaser would otherwise be entitled pursuant to the Collection Instruments, unless all Assessments and other amounts that Purchaser owes the Association or Seller have first been paid in full.  Purchaser's failure for any reason to pay on a timely basis any and all Assessments could result in the enforcement of the Association Security Interest (defined below) by the Association and the loss of Purchaser's Membership.  Purchaser's failure for any reason to use and occupy a Collection Accommodation shall not exempt Purchaser from his or her obligation to pay in full all Assessments levied against his or her Membership.

8.     **EXCHANGE PROGRAMS:**

The Association has entered into an Affiliation Agreement (the "**Affiliation Agreement**") with Diamond Resorts International Club, Inc. ("**DRIC**").  Under the Affiliation Agreement, the Association and the Collection are affiliated with THE Club.  Purchaser's membership in THE Club is automatic and is subject to the annual payment of  fees that are imposed by DRIC, and are subject to change in DRIC's sole discretion.  The Affiliation Agreement permits the annual membership fee for THE Club to be collected by the Association along with the Assessments.  Purchaser should refer to the Association budget for more details.  Under the Affiliation Agreement, membership in THE Club may not be transferred without the consent of DRIC and transfer by Purchaser of the Membership in the Collection does not, without the consent of DRIC, have the effect of transferring membership in THE Club.  THE Club may, but is not obligated to, have a relationship with an external exchange program.  At the current time, THE Club is affiliated with Interval International, Inc. ("**Interval International**") under which Interval International has agreed to offer its reciprocal exchange services to members of THE Club.  Exchanges through external exchange programs may be subject to certain terms, conditions and the payment of fees that are imposed by the external exchange program.  Seller makes no representations concerning THE Club, Interval International, or any other exchange programs that may become affiliated with the Collection, including but not limited to current or future services to be provided, the cost, continued availability, or success of exchange programs.  Any representations made regarding THE Club or Interval International by DRIC or its agents or employees or within the literature, brochures, or videos prepared or provided by DRIC or Interval International are solely the representations of DRIC or Interval International, respectively, and should not be relied upon as being the representations of Seller.

9.     **CLOSING:**

Except as otherwise provided by applicable law, for purposes of this Agreement, the term "**Closing**" shall mean that date when all of the following have occurred:  the cancellation period set forth in Section 21 has expired without Purchaser having exercised his or her rescission right;  Purchaser and Seller have executed, as applicable, all documents necessary to effect transfer of the Membership to Purchaser including, but not limited to, this Agreement, and if applicable, the Note;  Seller has received from Purchaser either (a) an executed Note for the Unpaid Balance, or (b) the Unpaid Balance in immediately available funds; and  the Purchaser has been entered into the Register of Members.  Except as otherwise expressly provided in any of the Collection Instruments to the contrary, Purchaser may not reserve, use, or occupy any Collection Accommodation or exercise any other rights, benefits, or privileges appurtenant to his or her Membership until Closing occurs.  If Closing has not occurred within one year following the date of this Agreement or because Purchaser has elected to rescind this Agreement pursuant to Section 21 below, then Seller will order any funds held on Purchaser's behalf, without interest, to be refunded by Escrow Agent to Purchaser, in which event this Agreement shall be deemed terminated and of no further force or legal effect.  Escrow Agent shall act as the closing agent for the purposes of collecting and disbursing all applicable funds and distributing and filing all applicable documents and instruments.  Upon Closing, Seller shall deliver to Purchaser a Points Certificate evidencing the Purchaser's Membership and a fully executed copy of this Agreement.

10.     **TITLE AND TITLE INSURANCE:**

All Collection Accommodations have been constructed and are available for use by Members pursuant to the Collection Instruments.  Purchaser understands and acknowledges that the basis for the Membership is certain real property interests (called "**Resort Interests**") in various resorts, hotels and other vacation properties and that title to those interests is held in a trust (the "**Trust**") for the benefit of the Association and Members pursuant to a recorded Trust Agreement with First American Trust, FSB, a federal savings

or another independent trustee ("**Trustee**"). Resort Interests are conveyed to the Trust subject to the Trust Agreement and Declaration and are otherwise not encumbered with blanket liens of any lender or lienholder or have a nondisturbance agreement in place which fully protects the use and enjoyment rights of each Member in the event of foreclosure. Further, in connection with each conveyance of Resort Interests to the Trust, Seller has caused First American Title Insurance Company to issue in favor of the Association, where available, an ALTA Owners Title Insurance Policy insuring the Trustee's ownership of the Resort Interests. Copies of such Owners Title Insurance Policies are available for inspection by Members at the offices of the Association.

11.    **SECURITY INTERESTS:**

(a)    **Seller's Security Interest.** If Seller is providing Financing to Purchaser in connection with the purchase of the Membership, then Purchaser, as debtor, hereby grants to Seller, as secured party, effective as of Closing, a purchase money security interest (the "**Seller Security Interest**") in the Membership and in all rights, benefits and privileges appurtenant thereto as established in the Collection Instruments and all rights, benefits and privileges accruing thereto in the future, all replacements and additions to the foregoing, and all proceeds thereof (collectively, the "**Collateral**") to secure Purchaser's performance under the Note, this Agreement, and the Collection Instruments. No waiver by Seller or any holder of this Agreement of any default or breach by Purchaser shall operate as a waiver of any other default or breach, whether of the same type or not, by Purchaser.

(b)    **Association's Security Interest.** Purchaser, as debtor, hereby grants to Association, as secured party, effective as of Closing, a security interest (the "**Association Security Interest**") in the Collateral to secure Purchaser's timely payment of Assessments and Personal Charges and Purchaser's performance under the Collection Instruments. The Association Security Interest shall, at all times, be junior and subordinate to the Seller Security Interest.

(c)    **Financing Statements.** Purchaser irrevocably authorizes Seller and the Association, at any time and from time to time, to file in any Uniform Commercial Code ("**UCC**") jurisdiction initial financing statements and any amendments thereto that provide any other information required by Part 5 of Article 9 of the UCC of the applicable jurisdiction for the sufficiency, or filing office acceptance of, any financing statement or amendment, including Purchaser's name and address, and if Purchaser is not an individual, Purchaser's type of organization and any organizational identification number issued to Purchaser. Purchaser shall furnish any such information in writing to Seller or the Association, as the case may be, within five (5) days after Seller's or Association's request. Each person identified as Purchaser in this Agreement represents and warrants to Seller and the Association that on the date of this Agreement he or she is domiciled in the state identified below his or her signature on this Agreement. Each person identified as a Purchaser in this Agreement shall notify Seller and the Association in writing if he or she changes his or her state of domicile within 30 days after such change. Such notice shall identify the state of such person's new domicile and his or her residential address therein.

(d)    **Association as Third-Party Beneficiary.** Solely for purposes of this Section 11, the Association is an intended third-party beneficiary of this Agreement and is entitled to enforce the Association Security Interest granted by Purchaser hereunder.

12.    **PURCHASER'S REPRESENTATIONS, WARRANTIES, AND ACKNOWLEDGMENTS:**

(a)    Purchaser represents and warrants that the persons signing this Agreement have the legal capacity and are duly authorized to do so. Purchaser represents and warrants that Purchaser is not, and shall not become, a person with whom Seller is restricted from doing business with under the regulations of the Department of Treasury Office of Foreign Asset Control ("**OFAC**"). Such representation shall include, but not be limited to, a representation that Purchaser is not a person or entity and is not acting on behalf of a person or entity named on OFAC's Specifically Designated Nationals and Blocked Persons list and Purchaser is not a resident or national of any Embargoed Country, as defined by OFAC. Purchaser acknowledges that prior to signing this Agreement, Purchaser received the state timeshare disclosure documents, together with the attached exhibits, all of which are hereby incorporated by this reference, and Purchaser agrees to be strictly bound by, and to comply fully with, the terms, provisions, and conditions of such documents, as each may properly be amended or supplemented from time to time. In the event of any conflict between this Agreement and the state timeshare disclosures, the state timeshare disclosures shall control. Purchaser further acknowledges and represents that the Membership is being purchased for Purchaser's personal use and not for its investment potential or any possible rent returns, tax advantages, depreciation, or other financial advantages and that no representations of any nature whatsoever have been made by Seller or any of its salespersons or other agents to Purchaser concerning investment potential, rent returns, tax advantages, depreciation, or other financial advantages. Purchaser, including any person or entity related to Purchaser, does not own an interest in more than 10 Memberships in the Collection. Purchaser understands that Seller has no resale or rental program for non-Seller owned Memberships and acknowledges that neither Seller nor any of its sales agents, employees, or other representatives has indicated that Purchaser will be assisted in the resale or rental of his or her Membership in the future. Purchaser represents that Purchaser does not intend to use any Collection Accommodation as his or her principal residence. If Purchaser has received Financing, then Purchaser acknowledges receipt of a completed Truth-in-Lending Disclosure Statement prior to executing this Agreement. Purchaser hereby agrees to indemnify and hold Seller harmless from and against any and all loss, threat of loss, suits, claims, actions, liabilities, damages, obligations, demands, costs and expenses (including attorney's fees) arising out of or in connection with any breach by Purchaser's representations and warranties. All of Purchaser's acknowledgments, representations and warranties set forth herein shall survive Closing.

(b)    Purchaser acknowledges and agrees that immediately following Closing, Seller shall have no further obligations or liabilities of any kind under this Agreement, or under any other document or instrument referred to in this Agreement, and Purchaser shall look solely to the Association and the Manager, together with any other entities that from time to time become obligated to Purchaser as provided in the Collection Instruments, for the fulfillment and satisfaction of any of Purchaser's rights, benefits, and privileges as a Member of the Collection, and not to Seller.

13.   **NO WARRANTIES:**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, OR BY APPLICABLE LAW, SELLER MAKES NO WARRANTIES, EXPRESS OR IMPLIED, OF ANY TYPE WHATSOEVER REGARDING THE COLLECTION OR THE COLLECTION ACCOMMODATIONS, INCLUDING BUT NOT LIMITED TO WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. SELLER EXPRESSLY DISCLAIMS, AND PURCHASER IRREVOCABLY WAIVES, EACH OF THE FOREGOING WARRANTIES.

14.   **DEFAULT:**

(a)      Subject to any notice and right to cure provided below, Purchaser shall be in default under this Agreement if Purchaser fails to pay on time, keep any promise, or fulfill any agreement or obligation contained in the Note, this Agreement or any of the Collection Instruments. In the event of a default by Purchaser, Purchaser shall not be entitled to reserve, use, or occupy any Collection Accommodation, or to exercise any other rights, benefits, or privileges appurtenant to his or her Membership.

(b)      **Subject to any notice and right to cure provided below, Purchaser and Seller agree that: Purchaser's default on or before Closing shall entitle Seller to immediately terminate this Agreement and all of Purchaser's rights, benefits, and privileges hereunder. Upon such termination, Seller shall retain or cause Escrow Agent to deliver to Seller all sums of money previously paid by Purchaser hereunder as liquidated damages and not as a penalty.**

(c)      Upon Purchaser's failure to timely perform any of Purchaser's obligations under the Note, this Agreement or any of the Collection Instruments after Closing, Purchaser shall be in default hereunder, whereupon Seller (or its successor or assign) may enforce the Seller Security Interest against the Collateral in accordance with this Subparagraph. Upon the occurrence of any such failure, including the non-payment of any amounts due and owing by Purchaser under the Collection Instruments, Seller shall give Purchaser written notice and if Purchaser has not cured the applicable failure within 10 days after Seller gives such notice if Purchaser has failed to pay money, or within 30 days after Seller gives such notice if Purchaser has failed to perform or observe any other term of the Note, this Agreement or any of the Collection Instruments, Purchaser shall be in default under this Agreement and Seller (or its successor or assign) may  enforce the Seller Security Interest in accordance with Article 9 of the UCC;  provide written notice of termination of the Membership and terminate the Membership within 60 days of the date of the notice of termination and retain all amounts previously paid by Purchaser as liquidated damages and not as a penalty; or pursue any other remedy available to Seller, at law or in equity, however, Seller hereby confirms that it will not seek any deficiency judgment against defaulting Purchaser beyond the forfeiture of the Membership.

(d)      Notwithstanding the foregoing provisions of this Section 10 to the contrary, if, for any reason, Seller is unable or fails to comply with the material provisions of this Agreement, then the sole obligation of Seller shall be to refund or cause Escrow Agent to refund (whichever is applicable) to Purchaser all payments previously made by Purchaser hereunder, without interest. Upon such refunds being made, this Agreement shall be deemed canceled, and all rights and obligations hereunder shall immediately terminate. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, PURCHASER HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES THAT MIGHT OTHERWISE BE AVAILABLE TO PURCHASER, AT LAW OR IN EQUITY.**

15.   **NO OTHER AGREEMENTS OR REPRESENTATIONS:**

Seller and Purchaser agree that this Agreement (including the documents and instruments incorporated by reference) embodies the entire agreement between them related to Purchaser's purchase and financing (if applicable) of the Membership and supersedes and replaces any and all prior negotiations, representations, agreements, and understandings, both oral and written, in connection therewith. No amendment to or modification of the terms of this Agreement shall be valid without the written approval of the legal counsel of Seller. Oral representations of Seller or Seller's agents should not be relied upon by Purchaser as correctly stating the representations of Seller. For correct representations, Purchaser should rely entirely on this Agreement and the documents and instruments contained by reference.

16.   **ASSIGNMENT AND SEVERABILITY:**

This Agreement shall be binding upon and inure to the benefit of the Parties, their respective heirs, successors, assigns, and personal representatives. Purchaser's Membership cannot be sold, assigned, transferred, conveyed, or encumbered except in accordance with the terms, provisions, and conditions hereof and the Collection Instruments. Purchaser acknowledges that Seller has the right, in its sole discretion, to assign some or all of its rights and interests hereunder and, if applicable, under the Note. Purchaser may not assign any of his or her rights or interests hereunder, without the written consent of Seller, which consent may be withheld in Seller's sole and absolute discretion. The terms and provisions hereof shall be deemed independent and severable, and the invalidity of any one provision or portion thereof shall not affect the validity or enforceability of any other provision hereof.

17.   **CHOICE OF STATE LAW AND FORUM; WAIVER OF JURY TRIAL:**

Except to the extent preempted by federal law, this Agreement shall be exclusively governed by and construed in accordance with the laws of Nevada without regard to its choice of law rules. Subject to Section 14 hereof, any legal action or proceeding arising out of or in any way relating to this Agreement which is not subject to the Arbitration provisions outlined below, shall only be brought in an appropriate court of competent jurisdiction on behalf of the Parties and their respective successors and assigns, hereby irrevocably submit to the jurisdiction of any such court and agree that venue properly lies solely in such courts to the exclusion of all other judicial and non-judicial forums. **EXCEPT AS OTHERWISE PROVIDED BY APPLICABLE LAW, THE PARTIES, AND ANY OTHER PERSON CLAIMING RIGHTS OR OBLIGATIONS BY, THROUGH, OR UNDER THIS AGREEMENT SHALL BE DEEMED TO HAVE WAIVED ANY RIGHT THEY MAY HAVE UNDER ANY APPLICABLE LAW TO A TRIAL BY JURY IN CONNECTION WITH ANY SUIT OR LEGAL PROCEEDING THAT MAY BE COMMENCED BY OR AGAINST ANY OF THE FOREGOING PERSONS CONCERNING THE**

INTERPRETATION, CONSTRUCTION, VALIDITY, ENFORCEMENT, OR PERFORMANCE OF THIS AGREEMENT OR ANY OF THE COLLECTION INSTRUMENTS.

18.     **ARBITRATION PROVISION**

(a)     Opt-Out Right.  **IF PURCHASER DOES NOT WANT THIS ARBITRATION PROVISION TO APPLY, WITHIN 30 DAYS PURCHASER MUST SEND A SIGNED LETTER TO SELLER STATING THAT THE ARBITRATION PROVISION DOES NOT APPLY.  OPTING OUT OF ARBITRATION WILL NOT AFFECT ANY OTHER PROVISION OF THIS AGREEMENT.**

(b)     Arbitration Terms Defined.  In this Arbitration Provision, the term "**Company Party**" means Seller and/or the Association, their affiliates and the agents, representatives, members, employees, officers and/or directors of such entities, if and to the extent that any Claim is asserted by or against such entity or person.  "**Bound Parties**" means each Company Party and Purchaser.  "**Claim**" means any legal claim, dispute or controversy between any Company Party and Purchaser, including statutory, contract and tort disputes of all kinds and disputes involving requests for declaratory relief, injunctions or other equitable relief.  However, "Claim" does not include any individual action brought by a Purchaser in small claims court or an equivalent court, unless such action is transferred, removed, or appealed to a different court, and does not include any dispute concerning the validity and effect of Section 18(h) below, the ban on class actions and certain other proceedings (the "**Class Action Ban**").  "**Administrator**" means the American Arbitration Association ("AAA"), 1633 Broadway, 10th Floor, New York, NY 10019, http://www.adr.org, or if Purchaser so elects in a notice given to Seller (which will serve as notice to each Company Party) within 20 days after a demand for arbitration, the National Arbitration Forum ("NAF"), P.O. Box 50191, Minneapolis, MN 55405, http://www.arb-forum.com.

(c)     Arbitration of Claims.  Unless Purchaser has exercised his or her opt-out right pursuant to Section 18(a), upon the election of Purchaser or any Company Party, any Claim between Purchaser and such Company Party shall be resolved by binding individual (and not class) arbitration.  Any arbitration will be conducted in accordance with this Arbitration Provision and, to the extent consistent with this Arbitration Provision, the rules of the Administrator in effect at the time the Claim is filed.  The neutral arbitrator shall be appointed within a specified period of time, which in no event shall be more than 60 days from the administrator's receipt of a written request from a Bound Party to arbitrate the Claim.  To the extent this Arbitration Provision conflicts with any other agreement binding the Bound Parties, this Arbitration Provision shall govern.

(d)     Fees; Location.  Any Company Party to a Claim asserted by Purchaser in good faith or to any Claim asserted by such Company Party will bear all fees of the Administrator or arbitrator in connection with such Claim.  The Company Party will also bear the reasonable fees and expenses of Purchaser's attorneys if any Claim initiated by Purchaser is resolved in Purchaser's favor.  If a participatory arbitration hearing is requested, it will take place in the county where this Agreement was signed or, if the Administrator determines that such location would be unfair to Purchaser, at a location reasonably convenient to Purchaser.

(e)     Governing Law.  This Arbitration Provision shall be governed by the Federal Arbitration Act (the "**FAA**") and not state arbitration laws, provided that Nevada law shall govern to the extent that state law is relevant under the FAA in determining the enforceability of this Arbitration Provision.  The arbitrator shall follow applicable substantive laws, statutes of limitations and privilege rules related to any Claim.  The arbitrator shall award the remedies, if any, that would be available in an individual court proceeding if arbitration had not been elected.  Upon the timely request of any Bound Party, the arbitrator shall write a brief explanation of the grounds for his or her decision.

(f)     Appeal of Arbitrator's Decision.  Any court with jurisdiction may enter judgment upon the arbitrator's award.  The arbitrator's decision will be final and binding, except for any appeal right under the FAA.

(g)     Jury Trial Waiver.  **IF A BOUND PARTY ELECTS TO ARBITRATE A CLAIM, NO BOUND PARTY WILL HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM.**

(h)     Class Action Ban.  **NO BOUND PARTY MAY PARTICIPATE IN A CLASS ACTION IN COURT OR IN CLASS-WIDE ARBITRATION, EITHER AS A REPRESENTATIVE, CLASS MEMBER OR OTHERWISE, WITH RESPECT TO ANY CLAIM. NO BOUND PARTY MAY PARTICIPATE IN A PRIVATE ATTORNEY GENERAL PROCEEDING IN COURT OR IN ARBITRATION, WITH RESPECT TO ANY CLAIM.  NO CLAIMS INVOLVING THE BOUND PARTIES MAY BE JOINED OR CONSOLIDATED WITH CLAIMS BY OR AGAINST ANY OTHER PERSON.**  Notwithstanding any language in this Arbitration Provision to the contrary, any dispute about the validity or effect of the above Class Action Ban shall be resolved by a court and not an arbitrator or the Administrator.

(i)     Survival; Severability.  This Arbitration Provision shall survive repayment of all amounts owed under this Agreement or the Note, the cancellation of this Agreement, any bankruptcy and any assignment of Seller's rights under this Agreement and/or the Note.  If any part of this Arbitration Provision is unenforceable (other than the Class Action Ban), the remainder of this Arbitration Provision shall still apply.  If the Class Action Ban is held to be unenforceable, this Arbitration Provision (other than this sentence) and any other arbitration provision between the Bound Parties shall be null and void in such proceeding, provided that the Company Party shall have the right to appeal any holding that the Class Action Ban is unenforceable.

19.     **NOTICES:**

Any notice that either party hereto desires or is required to give the other party under this Agreement shall be in writing and shall be deemed to have been duly given upon the earlier to occur of  its actual receipt;  3 business days after being deposited in the United States mail as first class mail, postage prepaid; or  1 business day after being sent via overnight courier service addressed to the applicable party at its address stated herein or at such other address as the receiving party has previously notified the giving party in

the manner prescribed in this Section.  If Purchaser consists of more than 1 person, then notice to any of them shall be deemed to constitute notice to all of them.  Unless and until written notice of an alternative addressee and address is received by the other party, the last addressee and address as stated by written notice or as provided herein, shall be deemed to continue in effect for all purposes hereunder.

20.    **MISCELLANEOUS:**

Purchaser is advised to read each and every paragraph very carefully.  No term, provision, condition, restriction, agreement, covenant, or obligation contained herein shall be deemed to have been abrogated or waived by reason of any failure by a party hereto to enforce the same, irrespective of the number of violations or breaches thereof that may occur.  The exercise of any right or remedy provided by law and/or the provisions of this Agreement shall not preclude the exercise of other consistent rights or remedies unless they are expressly precluded hereby.  Purchaser hereby grants Seller the right, in its sole discretion, to correct any scrivener's, typographic, or clerical errors in connection with this Agreement or any documents or instruments related hereto, provided that no such correction adversely affects any rights, benefits, or privileges afforded to Purchaser or materially alters any duties or obligations of Purchaser.  Any such corrections shall be initialed by an authorized representative of Seller and shall be legally binding upon Purchaser, together with its successors and assigns, even though not initialed or otherwise acknowledged by Purchaser.  Under no circumstances whatsoever shall this Agreement or any portion hereof be recorded in the public records of any county or other jurisdiction.  The captions used in this Agreement are for informational purposes only and do not amplify or limit in any way the provisions hereof.

*[Remainder of Page Intentionally Left Blank.  Section 21 and Signature Page Follows.]*

REV. 7/14/2014_7/23/2014

21.   **STATE SPECIFIC PROVISIONS:**

## PURCHASER'S NON-WAIVABLE RIGHT TO CANCEL

THE PURCHASER SHALL HAVE THE RIGHT TO CANCEL THIS AGREEMENT UNTIL MIDNIGHT OF THE SEVENTH (7TH) CALENDAR DAY FOLLOWING THE EXECUTION OF SUCH AGREEMENT. IF THE SEVENTH (7TH) CALENDAR DAY FALLS ON A SUNDAY OR LEGAL HOLIDAY, THEN THE RIGHT TO CANCEL THE AGREEMENT SHALL EXPIRE ON THE DAY IMMEDIATELY FOLLOWING THAT SUNDAY OR LEGAL HOLIDAY. CANCELLATION IS WITHOUT PENALTY, AND ALL PAYMENTS MADE BY THE PURCHASER BEFORE CANCELLATION MUST BE REFUNDED WITHIN FORTY-FIVE (45) DAYS AFTER SELLER'S RECEIPT OF THE NOTICE OF CANCELLATION. IF THE PURCHASER ELECTS TO CANCEL THIS AGREEMENT, HE SHALL ONLY DO SO EITHER BY HAND-DELIVERING THE NOTICE TO THE SELLER OR (II) BY MAILING THE NOTICE BY CERTIFIED UNITED STATES MAIL (EFFECTIVE ON THE DATE POSTMARKED), RETURN RECEIPT REQUESTED, TO: SELLER C/O RESCISSION COORDINATOR, DIAMOND RESORTS FINANCIAL SERVICES, INC., 10600 WEST CHARLESTON BOULEVARD, LAS VEGAS, NEVADA 89135.

IN WITNESS WHEREOF, Purchaser has executed this Agreement on the day and year first written above.

Signature: K. R. Pflugbeil                                              Signature: _____

Street Address:  **16 Greenway East**                     Street Address: _____

City, State, Zip Code:  **Sloatsburg, New York 10974**     City, State, Zip Code: _____

Home Telephone Number:   **845-753-2085**                  Home Telephone Number: _____

Business Telephone Number: _____        Business Telephone Number: _____

E-Mail Address:  **karp91@aol.com**                        E-Mail Address: _____


Signature: _____                        Signature: _____

PRIMARY MEMBER: _____                   **SELLER:**
                                                           Diamond Resorts U.S. Collection Development, LLC,
Primary Member's Address (if not set forth above):         a Delaware limited liability company

_____                                    By:  Diamond Resorts Developer and Sales Holding Company,
                                                            a Delaware corporation, its sole manager

_____                                     By: _____
                                                                Authorized Representative
_____
                                                                _____
                                                                Printed Name
REV. 9/22/2012_9252012
DMWEST #8125461 v12                                             _____
                                                                Acceptance Date
                                                                Catherine - 286 Sharpe
                                                                Sales Agent (Print)



| | | Statement Date | Amount Currently Due |
|---|---|---|---|
| | | 19-Apr-2016 | $21,675.00 |
| | | Case # | |
| | | 01-16-0000-1000-2-MH | |

Payment is due upon Receipt

# Invoice

Diamond Resorts International, Inc.
c/o Greenspoon Marder, PA
200 East Broward Boulevard
Suite 1800
Fort Lauderdale, FL 33301

Representing: Diamond Resort Hawaii Collection Development, LLC
Re: John and Ileana Morrow
Vs.
Diamond Resort Hawaii Collection Development, LLC
Diamond Resorts International, Inc.

**Please detach and return with Payment to Above Address**

**Please Indicate Case No. on Check**

------------------------------------------------------------------------------------------------



2200 Century Parkway, Suite 300
Atlanta, GA 30345
Telephone: (404)325-0101
Fax: (877)395-1388

Diamond Resorts International, Inc.
c/o Greenspoon Marder, PA
200 East Broward Boulevard
Suite 1800
Fort Lauderdale, FL 33301

Representing: Diamond Resort Hawaii Collection Development, LLC
Re: John and Ileana Morrow
Vs.
Diamond Resort Hawaii Collection Development, LLC
Diamond Resorts International, Inc.

| Invoice Date | Invoice No | Description | Amount |
|---|---|---|---|
| 13-Apr-2016 | 11651811 | Final Fee | $800.00 |
| 13-Apr-2016 | 11651801 | Arbitrator's Compensation for 5 hours of pre-hearing study time. | $1,875.00 |
| 13-Apr-2016 | 11651802 | Arbitrator's Compensation covering 3 days of hearing. | $9,000.00 |
| 13-Apr-2016 | 11651804 | Arbitrator's Compensation cover 20 hours of post-hearing study time. | $7,500.00 |
| 13-Apr-2016 | 11651814 | Final Fee for Claim | $2,500.00 |
| | | Net Amount Due | $21,675.00 |

**Remarks**   For any inquiries please call: (888)320-3502

Please mail check to   2200 Century Parkway, Suite 300
Atlanta, GA 30345
Telephone: (404)325-0101
Fax: (877)395-1388

# EXHIBIT B